**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| ERIKA LEIFER , SAUL JACOBS, and HELENE WENZEL, individually, and on behalf of all others similarly situated, | Case No.   3:16cv1008 |
| | **CLASS ACTION COMPLAINT DEMAND FOR JURY TRIAL** |
| *Plaintiffs*, | |
| v. | |
| GENWORTH FINANCIAL, INC., GENWORTH LIFE INSURANCE COMPANY, GENWORTH LIFE INSURANCE COMPANY OF NEW YORK, MICHAEL D. FRAZIER, THOMAS J. MCINERNEY, PATRICK B. KELLEHER, and MARTIN P. KLEIN, | |
| *Defendants*. | |

Plaintiffs Erika Leifer, Saul Jacobs, and Helene Wenzel ("Plaintiffs") bring this Class Action Complaint against Defendants Genworth Financial, Inc. ("GFI"), Genworth Life Insurance Company ("GLIC"), Genworth Life Insurance Company of New York ("GLICNY") (collectively, the "Corporate Defendants"), Michael D. Frazier, Thomas J. McInerney, Patrick B. Kelleher, and Martin P. Klein (collectively, the "Individual Defendants"; together with the Corporate Defendants, "Genworth" or "Defendants") individually and on behalf of the proposed Classes as defined herein.  Plaintiffs allege the following upon information and belief, except for those allegations that pertain to themselves, which are based on Plaintiffs' personal knowledge:

## INTRODUCTION

1.      This case concerns the financial harm caused to millions of current and former policyholders of Genworth long term care ("LTC") insurance policies, as a direct result of Defendants' deliberate misconduct in wrongfully depleting needed policy reserves—which is the portion of an insurer's revenue held aside to pay future claims.

2.      LTC insurance, one of the principal products sold by Defendants, is intended to help defray the cost of home care, assisted living care, adult day care, respite care, hospice care, nursing home and other specialized skilled facility care required when an individual becomes unable to perform the basic activities of daily living (such as dressing, bathing, eating, toileting, continence, transferring (getting in and out of a bed or chair), or walking).  These costs are generally not covered by health insurance, Medicare or Medicaid.

3.      LTC insurance is purchased by individuals before they become physically or mentally infirm and require daily care, as a way to protect their life savings from the escalating costs of 24-hour health care at the end of their lives (when this is most likely to occur).  As a result, the financial condition of any LTC insurer and its ability to pay claims well into the future based on relatively stable premium rates is critical to purchasers.

4.      At all relevant times alleged herein Genworth, the country's largest provider of LTC insurance, successfully sold its LTC policies to Plaintiffs and other class members by publicly touting its long history and vast experience in this particular market, as well as its financial strength and ability to pay future claims based on its publicly stated claim reserves.

5.      As it turns out, however, Genworth's publicly touted financial strength and ability to pay future claims was a hoax.

6.      Defendants executed an undisclosed scheme from 2010 until late 2014 to buoy Genworth's stock price and enrich themselves by diverting hundreds of millions of dollars of

2

policyholders' premium payments away from Genworth's reserve funds and into their own pockets and the coffers of GFI and its investors.

7.      As the largest provider of LTC insurance, Defendants often boasted that their large proprietary data set, based on a wealth of actual claims experience, put the Company in a unique position to manage their LTC insurance products and leverage this experience to meet market challenges that other insurers could not.

8.      But notwithstanding Defendants' access to, and stated reliance on, its *actual* claims data, Defendants' scheme depended upon their deliberate use of *outdated* claims experience data regarding the average duration of a LTC claim when calculating their reserves. Indeed, rather than using the actual claim duration of 3 years, as reflected in Genworth's vast database of claims, Defendants calculated their reserves using an outdated claim duration of approximately 2.2 years.  This had a dramatic effect on the level of statutory reserves GLIC and GLICNY were required to maintain, causing the reserves to be underfunded in relation to the true expected need.

9.      By intentionally using outdated claims data, Genworth falsely underreported the amount of reserves it needed to pay future claims, and underfunded its reserves for nearly four years.  The artificial suppression of its reserves, in turn, created the false appearance in Genworth's publicly reported financial statements that the Company was far more profitable than it actually was, because the monies that should have been used to fund the actual needed reserves were instead allocated to the company's profits.

10.      As a result of the fraudulent statements of its reserve requirements and corresponding underfunding of its reserves, GLIC and GLICNY (which sold and managed Genworth's LTC policies), reported illusory profits, which then allowed them to pay unearned

dividends to GFI.  That money was then used to meet unrelated operating expenses and pay

unearned executive compensation (much of which was tied directly to the size of these illicit

dividends).

11.     This false picture of profitability buoyed Genworth's stock price, as Defendants

intended.  It also created a false depiction of Genworth's financial strength and stability that

Defendants used to keep existing LTC customers and garner new ones by seemingly avoiding the

same level of rate increases that had plagued Genworth's LTC competitors.

12.     On November 5, 2014, the truth became known when Defendants finally admitted

that Genworth had not properly accounted for its reserves, and those reserves were now

underfunded by more than half a billion dollars.

13.     That revelation sent GFI's stock price tumbling and Genworth has since settled a

securities fraud lawsuit covering claims related to the stock price.  But while Genworth has

compensated investors for some of the damages that were caused by the fraud, there is another

class of people directly damaged by Defendants' misconduct that have not yet received any relief

and, in fact, have essentially been asked to pay for the fraud themselves— the LTC

policyholders.

14.     Rather than fund the reserves in the amount they were wrongly depleted,

Defendants have subsequently embarked on corrective action to "undo" the financial harm

caused by the fraud by turning to Plaintiffs and the Class of LTC policyholders to replenish those

reserves through either increased premium payments, reductions in benefits, or policy

terminations.  Plaintiffs have been told by Defendants, through form letters announcing premium

increases, that they can either (1) continue paying their prior premiums and receive *less* benefits,

(2) pay *more* in premiums to maintain their prior level of benefits, or (3) terminate their policies

altogether.  Each of these unpleasant options were directly caused by Defendants' fraud and not a change in the LTC market forces or Genworth's claims experience, and thus they offer a clear picture of the magnitude of harm caused by the fraud.

15.     To be clear, Plaintiffs do not allege that the increased premiums or benefit reductions are themselves the damages caused by Defendants' fraud, though that is not to say that they are not relevant to their claims. That is, the premium increases are essentially admissions that the LTC policies purchased by Plaintiffs and the class are far less valuable as a result of the fraud.

16.     Other LTC providers have raised premiums to cover shortfalls in their reserves that might be fairly attributable to changes in claims experience for their LTC policies.  But to Plaintiffs' knowledge, none of those companies fraudulently diverted half a billion dollars in premium payments away from their reserves and into their holding companies or their own pockets.  And, none of those LTC providers, to Plaintiffs' knowledge, used claims assumptions that they knew to be false and outdated based on their own claims experience.

17.     The false perception of Genworth's financial health and the adequacy of its reserves is also material to new policyholders' decision to buy LTC policies from Genworth and existing policyholders' decision to continue making payments on their policies, actions they would not have undertaken had the true condition of Genworth been revealed earlier, or had Plaintiffs and members of the Class known that the Company they trusted to provide LTC insurance was actively working to defraud them to enrich themselves.

18.     Each payment by Plaintiffs and the Class during the Class Period was based on several false pretexts, promises, financial statements and betrayed trust, as set forth herein.  Each premium payment by Plaintiffs and the Class during this period represents damages to them.

19.     Also, because the reserves were severely depleted by Defendants' fraud, the value of each Class member's LTC policy has been substantially reduced, in part because the benefits that can be provided based on the decreased reserves has been materially diminished.  Because of Defendants' misconduct in failing to adequately reserve premiums paid on these LTC policies, Defendants now need to raise additional capital to adequately fund the reserves either through public financing, premium rate increases, or other sources of funds, acts that will continue to damage the Class in the future.

20.     Finally, for those members of the Class that chose to purchase a new policy from another insurer after revelation of Defendants' scheme on November 5, 2014, the premiums on such a policy will be substantially higher because the investment they made with Genworth at a younger age to attain a lower premium is now worthless, and they must procure new more expensive insurance from another company due to their older age.

21.     Defendants' wrongful dissipation of the reserves necessary to pay future claims (as well as their misrepresentation of their reserve condition to regulators and failure to disclose such dissipation to regulators or the Class) was in violation of uniform state common law principles and certain state-specific statutes. Plaintiffs and class members have been injured-in-fact inasmuch as they were directly and adversely affected pecuniarily.

22.     Consequently, Plaintiffs, as well as other similarly situated policyholders that comprise the Classes, now seek either restitution, damages for the diminution in their policies' economic value, or damages for out-of-pocket losses incurred by former policyholders who have had to pay higher premiums for new LTC coverage to replace terminated Genworth policies.

**JURISDICTION AND VENUE**

23.     This Court also has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA").  Plaintiffs are citizens of the States of New

York and California, and the Commonwealth of Pennsylvania.  Defendants are citizens of

different states, with their principle place of business in Virginia. The amount in controversy in

this action exceeds $5,000,000, and there are more than 100 members in each of the classes.

24.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendants

regularly conduct business in this district, Defendant Genworth Financial Inc., has its corporate

headquarters in this district, and Defendants Genworth Life Insurance Company and Genworth

Life Insurance Company of New York have their administrative offices in this district, and a

substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

<u>Plaintiffs</u>

25.     Plaintiff Erika Leifer resides in New York, New York.  On September 11, 2002,

at age 51, Plaintiff Leifer purchased a long-term care insurance policy from GLICNY.  That

policy (number VDG7512431) had a quarterly premium of $500.24.  On July 5, 2004, at age 53,

Plaintiff Leifer purchased a second GLICNY LTC policy.  That policy (number VDG7532148)

had a quarterly premium of $270.40.  During the Class Period, Plaintiff Leifer made premium

payments to GLICNY of more than $12,000.00.

26.     By letters dated February 20, 2016, GLICNY informed Plaintiff Leifer, now age

65, that the premiums on both of her long-term care insurance policies would be increasing by

60%, and warning that "it is possible that your premium will increase again in the future."  In

that letter, GLICNY explained that the decision to increase premiums was not based upon any

change in health or "the current economic environment."  Rather, "Our decision to increase

premiums is primarily based upon the fact that the expected claims over the life of your policy

are significantly higher today than was anticipated when your policy form was originally priced,

and as a result, a premium rate increase is warranted."

27.     The letters made no mention of the facts alleged herein relating to Defendants'
manipulation of the Company's financial reporting and reserve calculations, or the unearned
dividends that were paid to GLICNY's holding company rather than used to adequately fund
reserves.

28.     The letters informed Plaintiff Leifer that the premium on policy number
VDG7532148 would increase from $270.40 to $432.64 per quarter, and on policy number
VDG7512431 would increase from $500.24 to $800.38 quarterly.

29.     Plaintiff Saul Jacobs resides in Huntington Valley, Pennsylvania.  On May 20,
2003, at age 51, he purchased from Genworth Electrical Capital Assurance Company (which
became GLIC on January 1, 2006), a long-term care insurance policy.  That policy (number
UDG4488217) had an annual premium of $2,308.80.  During the Class Period, Plaintiff Saul
Jacobs made premium payments to Genworth of more than $9,000.00

30.     By letter dated March 16, 2016, GLIC informed Plaintiff Jacobs, now age 65, that
the premiums on his long-term care insurance policy would be increasing by 20% and warning
that "it is likely that your premium will increase again in the future."  In that letter, GLIC
explained that "Our decision to increase premiums is primarily based upon the fact that the
expected claims over the life of your policy are significantly higher today than was anticipated
when your policy form was originally priced.  Our decision to increase premiums was not based
upon the current economic environment."

31.     The letter made no mention of the facts alleged herein relating to Defendants'
manipulation of the Genworth's financial reporting and reserve calculations, or the unearned
dividends that were paid to GFI rather than used to adequately fund GLIC and GLICNY's
reserves.

32.   The letters informed Plaintiff Jacobs that the premiums on policy number UDG4488217 would increase from $2,308.80 to 2,770.56 per year.

33.   Plaintiff Helene Wenzel resides in San Francisco, California.  On January 30, 2003, at age 58, Plaintiff Wenzel purchased from Genworth Electrical Capital Assurance Company (which became GLIC on January 1, 2006) a LTC insurance policy.  That policy (number UDG4405898 ) had a quarterly premium of $477.36.  During the Class Period, Plaintiff Wenzel made premium payments to GLIC of more than $7,000.00.

34.   By letter dated December 6, 2016, GLIC informed Plaintiff Wenzel, now age 72, that the premium on her LTC insurance policy would be increasing by 26% in phases over the next three years, and warning that "it is likely that your premium may increase again in the future."  In that letter, GLIC explained that the decision to increase premiums was not based upon any change in health or "the current economic environment."  Rather, "Our decision to increase premiums is primarily based upon the fact that the expected claims over the life of your policy are significantly higher today than we originally anticipated when your policy form was priced."

35.   The letter made no mention of the facts alleged herein relating to Defendants' manipulation of the Company's financial reporting and reserve calculations, or the unearned dividends that were paid to GFI rather than used to adequately fund reserves.

36.   The letter informed Plaintiff Wenzel that the premium on policy number UDG4405898 would increase from $477.36 to $518.89 on February 11, 2017, then to $560.42 on February 11, 2018 and then to $601.47 on February 11, 2019.

The Corporate Defendants



37.     Defendants GFI, GLIC and GLICNY are related entities that form part of the Genworth insurance group.

38.     Genworth's business is divided into two divisions: Global Mortgage and U.S. Life Insurance. The Company's U.S. Life Insurance Division includes its LTC insurance business unit. As Defendant McInerney acknowledged during a September 25, 2013 investor conference, "our core business is long-term care." Genworth began selling LTC insurance policies in 1974, and today is the largest remaining LTC insurance provider in the country. Between 2010 and 2014, over 50% of the Company's U.S. Life Insurance revenues came from its LTC insurance business unit.

39.     Genworth's Headquarters for LTC insurance is located in Richmond, Virginia.

40.     Defendant GFI is a publicly traded company and the ultimate parent of GLIC and GLICNY.  GFI maintains its principal executive offices at 6620 West Broad Street, Richmond, Virginia. Genworth became a public company in 2004 and its common stock trades on the New York Stock Exchange under the ticker symbol "GNW."

41.     Defendant GLIC is an indirect subsidiary of GFI and is organized under the laws of Delaware with its main administrative office in Richmond, Virginia.  Among other products, GLIC issues LTC insurance policies nationwide, including in California and Pennsylvania.

42.     Defendant GLICNY is a subsidiary of GLIC and an indirect subsidiary of GFI. GLICNY is 65.5% owned by GLIC and 35.5% owned by GLIC's wholly owned subsidiary, Genworth Life and Annuity Insurance Company.  GLICNY is organized under the laws of New York. GLICNY issues insurance policies, including LTC insurance policies, primarily in the state of New York.  Although the majority of its policyholders reside in New York, some of its policyholders reside in states other than New York.  For example, GLICNY typically receives around $500,000 in annual LTC premiums from policyholders residing in the state of Virginia.

43.     GLIC and GLICNY are parties to various intercompany agreements for shared services and expenses.  For example, GLIC and GLICNY are parties to an Administrative Services Agreement whereby GLIC provides GLICNY with advertising, actuarial, legal, electronic data processing, preparation of accounting records, underwriting, claims and marketing services.

The Individual Defendants

44.     Defendant Michael D. Frazier ("Frazier") was Chairman of Genworth's Board of Directors, President and Chief Executive Officer since the completion of Genworth's initial public offering ("IPO") in May 2004 until his resignation on May 1, 2012.

45.     Defendant Thomas J. McInerney ("McInerney") has been Genworth's CEO and President since January 2013.  While maintaining his responsibilities as CEO and President, McInerney took on the additional roles of CEO of Genworth's U.S. Life Insurance Division and

head of its long-term care insurance business in July, 2014.  At all relevant times, McInerney has been a member of Genworth's Board of Directors and its Long-Term Care Steering Committee.

46.     Defendant Patrick B. Kelleher ("Kelleher") was Genworth's CFO from 2007 through May 2011.  On January 1, 2011, Kelleher was appointed Executive Vice President – Genworth and the leader of Genworth's Retirement and Protection Segment responsible for Genworth's LTC business. Genworth "resegmented" in October 2011, and for 2012, Kelleher became responsible for the U.S. Life, International and Wealth Management segments, which included LTC.  In 2013, Genworth "resegmented" again with Kelleher responsible for Genworth's U.S. Life Insurance segment, which continued to include LTC. Kelleher was terminated from his employment effective December 31, 2013.

47.     Defendant Martin P. Klein ("Klein") was Genworth's CFO from May 2011 through October, 2015, and served as its acting President and acting CEO from May 2012 through December 2012.  At all relevant times, Klein was also a member of Genworth's Long-Term Care Steering Committee.

## FACTUAL BACKGROUND

**A.  An Insurance Company's Financial Condition and Ratings Are Important Considerations for Insureds When Maintaining a Policy or to New Insureds Looking to Purchase a Policy**

48.     When purchasing LTC insurance, consumers place a large degree of trust in their insurance provider.

49.     In a LTC insurance contract, the insured is required to make monthly payments with the expectation that the insurance provider will be there years down the road when an insured's claim might eventually accrue.

50.     Consumers of LTC insurance, like Plaintiffs, often purchase their policies years or decades before they anticipate making any claim on the policy.

51.     Indeed, purchasing insurance at a younger age typically results in lower initial premiums.  This is because almost all LTC policies have level premiums payable for life.[1]  Thus, claims are expected to be less than premiums paid in the early years and will exceed premiums in later years as depicted in the chart below.



52.     As the policyholder ages, the expected incurred claims will increase over and above the premium that would be paid by the policyholder if the LTC policy contract were entered into earlier in life.  Thus, individuals who delay purchase of a LTC policy, or who seek to change providers, will typically have to pay a far higher premium than they would have been required to pay had they obtained LTC insurance earlier in life.  In other words, once obtained and after the policyholder pays premiums for a number of years, the likelihood that the

---

[1] However, premiums are not guaranteed.  If experience is adverse, a company can file for states' approvals to increase premiums by risk class.  But as alleged herein, it was Defendants' mismanagement and fraud that necessitated premium increases, not experience.

policyholder would be able to find alternative insurance at a lower price than his or her existing policy trends to zero.

53.     A primary consideration in choosing a LTC insurance provider is the insurer's financial condition and stability.

54.     The financial condition and stability of an insurer is reflected, in part, in a company's financial statements and in financial ratings, as issued by ratings agencies such as A.M. Best, Moody's Investor Services, Standard & Poors, or Fitch Ratings.

55.     State insurance commissioners, through their websites, specifically advise consumers to consider such financial information when choosing an insurance provider.

56.     For example, in its Guide to Consumers on LTC policies (*revised January, 2014*) the California Insurance Commissioner advises "[a]n insurance company's financial standing and track record are important in choosing a long-term care insurance policy" and "[a] company's size and ratings are important factors to take into consideration when making your long-term care insurance choice."

57.     The New York Insurance Commissioner offers similar advice, suggesting (http://www.dfs.ny.gov/consumer/ratings_stability.htm):

> **Insurance Company Ratings and Stability**
>
> When selecting an insurance policy, you are also selecting an insurance company and you may wish to know how stable that company is financially. Many firms rate the financial soundness of insurance companies … Each firm has a different rating scale and firms may differ in the conclusions they reach about a specific insurance company. Therefore, you may wish to check with more than one firm before selecting an insurance company.

58.     The National Association of Insurance Commissioners ("NAIC") is the United States standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia, and five U.S. territories.

59.     In its publication <u>A Shopper's Guide to Long-Term Care Insurance</u>, the NAIC advises:

> **Check the financial stability of the insurance company.**
>
> Insurer ratings can show you how analysts see the financial health of individual insurance companies. Different rating agencies use different rating scales. Be sure to find out how the agency labels its highest ratings and the meaning of the ratings for the companies you're considering.

**B.   <u>Ratings Along With Accounting and Financial Reporting Requirements for Insurance Companies are Designed to Protect Policyholders</u>**

60.     Among the goals included in NAIC's mission statement is to "[p]rotect the public interest" and to "[p]romote the reliability, solvency and financial solidity of insurance institutions." (NAIC website, at <u>http://www.naic.org/index_about.htm</u>).

61.     In furtherance of its mission to protect policyholders, the NAIC developed a system of accounting unique to insurance companies that focuses on solvency. That system, referred to as the Rules of Statutory Accounting for Insurance Companies ("SAP"), places its focus on a conservative accounting for an insurer's balance sheet.  Indeed, as explained by the Insurance Information Institute website:

> To protect insurance company policyholders, states began to monitor solvency. As they did, a special insurance accounting system, known as statutory accounting principles, or SAP, developed. The term *statutory* accounting denotes the fact that SAP embodies practices required by state law. SAP provides the same type of information about an insurer's financial performance as GAAP but, since **its primary goal is to enhance solvency**, it focuses more on the balance sheet than GAAP. GAAP focuses more on the income statement. (Emphasis added)

62.     Insurance companies doing business in the United States are required to prepare their financial statements in conformity to SAP, as set forth in the NAIC Accounting Practices and Procedures ("AP&P") Manual.

63.     The Statutory Accounting Principles rest on principles of conservatism, consistency and recognition. Indeed, the SAP Preamble, entitled "Scope of Project" states:

> The application of conservatism, consistency and recognition assure that guidance developed and codified as part of this project is consistent with the underlying objectives of statutory accounting.

64.     The SAP Preamble's "Conclusion" states in pertinent part:

> Application of SAP, either contained in the SSARs or defined as GAAP and adopted by NAIC, to unique circumstances or individual transactions should be consistent with the concepts of conservatism, consistency, and recognition.

65.     These fundamentals of statutory accounting for insurance companies are unique and differ from other financial accounting methods, because the focus is on solvency for the protection of policyholders. This is because insurance contracts, like long-term care insurance, involve a promise to pay which extends years (often decades) into the future.

66.     A basic tenet of statutory accounting for insurance companies is conservatism in valuation and accounting to protect policyholders: "Conservative valuation procedures provide protection to policyholders against adverse fluctuations in financial condition or operating results. Statutory accounting should be reasonably conservative over the span of economic cycles and in recognition of the primary responsibility to regulate for financial solvency." AP&P Manual, ¶ 30.

67.     Thus, as an insurer, GLIC and GLICNY were required each year to prepare and file with their insurance regulators sworn Annual Statements based on the convention blank form adopted by the NAIC that accurately reported its financial condition.

68.     Central to the principles of statutory accounting, and inherent in all of its requirements, is the requirement of transparency and adequate disclosure.

69.     It is essential that insurance companies fully and accurately disclose their financial condition, as the ability to protect the company's policyholders rests squarely on accurate reporting.

70.     Accurate Annual Statement reporting is critically important, because it enables the public, including consumers, brokers, agents, ratings agencies and others, to develop an assessment of the company's financial strength and evaluate the company's ability to pay future claims as they come due.

71.     An insurance company's Annual Statement, statutory surplus and risk-based capital ratios (defined below) are the key variables in the financial strength rating assigned by ratings agencies.

72.     For example, A.M. Best, a rating agency that historically focuses on the insurance industry, issues financial strength ratings that provide an opinion of an insurer's financial strength and ability to meet its ongoing obligations to policyholders. The financial strength rating is based on the surplus, RBC (risk-based capital) ratio and other data the insurance company reports in its Annual Statement "since it is the foundation for policyholder security." A.M. Best Methodology, Criteria – Insurance, May 2, 2012, at page 1.

73.     As A.M. Best explains on its website, a financial strength rating is important because insurance agents and professionals depend on it "to assess the creditworthiness of an insurer's operations, to evaluate prospective reinsurance accounts, to compare company performance and financial condition," and a "rating can influence an agent's selection of plans to market." Moreover, "[a] rating also is an important factor in the consumer's decision-making process to purchase insurance," and it "can provide consumers with the information necessary for an educated buying decision." (http://www.ambest.com/ratings/guide.asp).

17

74.     In 2010, GLIC and GLICNY enjoyed excellent financial strength ratings from the major rating agencies. For example, Fitch rated both Genworth subsidiaries A-[2], while Moody's gave the companies an A2 rating[3] and A.M. Best gave them both an A.[4] Each of these ratings indicate a company with a solid balance sheet and the ability to meet future obligations.  Such ratings were important to existing policyholders as well as potential new customers.  But, as described herein, by the end of 2014, when the true measure of Genworth's solvency was disclosed, those ratings were significantly reduced.

**C.  The Important Solvency Measures**

75.     Insurers' solvency is evaluated using several key metrics including an evaluation of the insurer's capital and surpluses.  In particular, statutory reserves and RBC together make up the total amount of assets needed to retire a company's obligations with a reasonable margin of protection from insolvency.

76.     State regulations specify reserve standards.  *See, e.g.*, 14 VAC5-200-140.  State regulators further prescribe RBC standards.

77.     Generally, reserves for an insurer's obligations to policyholders are by far the insurer's largest liability.

---

[2] "A" Insurer Financial Strength (IFS) Ratings denote a low expectation of ceased or interrupted payments. They indicate strong capacity to meet policyholder and contract obligations. This capacity may, nonetheless, be more vulnerable to changes in circumstances or in economic conditions than is the case for higher ratings.  *See* https://www.fitchratings.com/site/definitions/insurerratings.

[3] Moody's defines an "A" rating as follows: "Obligations rated A are judged to be upper-medium grade and are subject to low credit risk."  Moody's further scales "A" ratings from "1" through "3".  *See* https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

[4] A.M. Best defines an "A" rating as follows: "Assigned to insurance companies that have, in our opinion, an excellent ability to meet their ongoing insurance obligations."  *See* http://www.ambest.com/ratings/guide.pdf

78.     Insurance generally requires three basic types of reserves: unearned premium reserve, contract (active life) reserves, and claim (disabled life) reserves.  Active life and claim reserves form the principal reserves held by insurance companies in connection with LTC policies.

79.     The purpose of the active life reserve is essentially to match the expected premium revenue (reflecting payment pattern and period) with how the benefit costs are expected to emerge over the life of the policy.  For LTC insurance, the benefit costs are expected to increase significantly by the attained age (because utilization increases with age), by duration (as underwriting selection wears off), and due to plan design features such as automatic compound inflation adjustment to benefits.

80.     Claim reserves are basically the net present value of future benefit amounts not yet due on claims that were incurred prior to the valuation date.

81.     The amount of these required reserves is determined by actuarial accounting methods that account for, among other things, expected benefit costs over the life of the policy.  Thus, the assumptions used in establishing the expected duration of claims has a direct and material effect on the amount of required reserves.  If the claims' duration assumption is significantly lower than the actual experience, the insurance company's reserves will be inadequate.

82.     In addition to reserves, insurers are required to maintain minimum RBC levels to assist in covering momentary demand on surplus.

83.     The RBC ratio is determined by dividing an insurer's Total Adjusted Capital (that is, the actual amount of capital and surplus the insurer has, plus other items that the RBC instructions may provide) by its Authorized Control Level Risk-Based Capital (*i.e.*, the minimum

amount of capital required under the risk-based capital formula).  As the difference between these numbers increases, the more secure an insurer appears and the higher its RBC ratio becomes.

84.     Regulators require RBC to be determined by a formula that incorporates individualized measures of an insurer's main risk exposures, including its asset risks, interest rate risks, credit risks, and, in the case of LTC insurers, morbidity risks and other risks that influence the likely duration of claims.

85.     An insurance company's RBC information, including its RBC ratio, is a critical measure of the insurer's financial strength.  An insurer's perceived financial strength is a material factor in purchasing and renewal decisions made by brokers, agents, and consumers interested in purchasing LTC insurance.  Rating agencies, in particular, heavily weight insurers' total RBC levels in assessing insurers' financial strength.

86.     Because an insurer's RBC ratio depends on its total capital, and its total capital depends on its aggregate assets, liabilities, and surplus, insurers can boost their RBC ratio and their apparent financial strength by reducing their reserve liabilities.  An understated reserve liability will make an insurer's existing level of assets appear to provide policyholders with greater protection against loss than is actually the case.

87.     The expected duration of claims, likewise, has a material effect on the RBC ratio, because it (and associated costs) has a direct and material effect on the amount of required reserves.  If the amount of required reserves is artificially suppressed or understated, the RBC ratio becomes artificially inflated.

88.     Where the RBC ratio is artificially inflated and the company has underfunded reserves, the solvency of the company is imperiled.

89.     As explained in the SAP Preamble, solvency is a means to "ensure that the policyholder, contract holder and other legal obligations are met when they come due and that the companies maintain capital and surplus at all times and in such forms as required by statute to provide an adequate margin of safety."

90.     SAP accounting requires insurers to make a good faith estimate of their reserves based on certain enumerated factors, and in keeping with the spirit of SAP that calculation should be made conservatively such that any error in estimating reserves should be on the side of promoting solvency.

91.     According to the Insurance Information Institute, "actuarial estimates of the amounts that will be paid on outstanding claims must be made so that profit on the business can be calculated.  Insurers estimate claims costs . . . based on their experience.  Reserves are adjusted, with a corresponding impact on earnings, in subsequent years as each case develops and more details become known."

**D.  The Relationship Between Reserves and Dividends**

92.     Measured on a return on investment basis, profitability on LTC insurance depends on RBC and reserve requirements, as well as emerging actual experience as compared to pricing expectation.  In many companies, RBC is a significant consideration in the viability of the LTC product line as it competes with other lines for capital.

93.     The ability to transfer profits between and among entities in an insurance group (such as Genworth) is constrained by these same RBC and reserve requirements and is premised on the amount of surplus held by individual insurance companies.

94.     When the value of the company's Admitted Assets is greater than its liabilities, it results in a surplus.  If an insurance company's surplus is above minimum legal levels, it is

permitted to pay a dividend. On the other hand, if an insurance company's surplus falls below the

minimum legal levels, or if the company operates at an annual loss, it is not permitted to pay

dividends and may be forced to suspend operations.

95.     The justification for this requirement is fairly obvious; an insurance company

should not pay out dividends if it has not first adequately set aside or reserved a portion of its

assets to ensure future obligations to policyholders are met.

96.     To this point, Virginia, California, New York, and other states, have regulations

that specify when an insurance company may pay a dividend.

97.     For example, Virginia's code states:

> 38.2-1330.1. Dividends and other distributions.
>
> A. Except as otherwise provided by law, a domestic insurer shall not
> declare or pay a dividend or other distribution from any source other than
> earned surplus without the Commission's prior written approval. For
> purposes of this section, "earned surplus" means an amount equal to the
> unassigned funds (surplus) of an insurer as set forth in the most recent
> annual statement of the insurer filed with the Commission including all or
> part of the surplus arising from unrealized capital gains or revaluation of
> assets. No domestic insurer shall pay an extraordinary dividend or make
> any other extraordinary distribution to its shareholders until the earlier of:
>
> 1. Thirty days after the Commission has received written notice of the
> declaration thereof and has not within such period disapproved such
> payment; or
>
> 2. The Commission's approval of such payment.

98.     If a company's reserves are inadequate, funds that were accounted for elsewhere

in its finances must be re-allocated to its reserves, thus negatively impacting the company's

profit, liquidity and perhaps even its solvency, in which case the company may be forced to raise

capital.

99.     If an insurance company understates the size of its necessary reserves, such as by using outdated claims experience data reflecting shorter claim durations than the company was actually experiencing, then the company may avoid increasing reserves and thus overstate its income and understate its liabilities.  This would create the illusion of profitability and perhaps allow the company to pay dividends that were not actually earned.

**E.   How Genworth Calculated Reserves and Paid Dividends to the Holding Company**

100.    Genworth's insurance subsidiaries, including GLICNY and GLIC, maintain both active life and claim reserves.  The size of GLIC and GLICNY's "active life reserves" are much larger than their "claim reserves."

101.    The adequacy of these reserves is critical to Genworth's financial stability.  In fact, Genworth's profitability, liquidity, solvency and its financial ratings by agencies such as Fitch, S&P and Moody's are all directly related to the amount and adequacy of its reserves.

102.    As Genworth explains in its annual reports: "**As a holding company, we depend on the ability of our subsidiaries to transfer funds to us to pay dividends and to meet our obligations.**"

103.    Genworth's annual reports go on to state:

> We act as a holding company for our subsidiaries and do not have any significant operations of our own. Dividends from our subsidiaries and permitted payments to us under our tax sharing arrangements with our subsidiaries are our principal sources of cash to meet our obligations. These obligations include our operating expenses and interest and principal on our current and any future borrowings. These obligations also include amounts we owe to GE under the Tax Matters Agreement. If the cash we receive from our subsidiaries pursuant to dividends and tax sharing arrangements is insufficient for us to fund any of these obligations, or if a subsidiary is unable to pay dividends to us, we may be required to raise cash through the incurrence of debt, the issuance of additional equity or the sale of assets.

104.    Genworth's insurance subsidiaries are only permitted to pay dividends to its holding company if, after adequately reserving, it has an adequate surplus.  As the Company explained:

> The payment of dividends and other distributions to us by each of our insurance subsidiaries is regulated by insurance laws and regulations. In general, dividends in excess of prescribed limits are deemed "extraordinary" and require insurance regulatory approval. In addition, insurance regulators may prohibit the payment of ordinary dividends or other payments by our insurance subsidiaries to us (such as a payment under a tax sharing agreement or for employee or other services) if they determine that such payment could be adverse to our policyholders or contract holders.

105.    Thus, if GLIC and GLICNY understated their reserve obligations to regulators, they would create a phantom "surplus" that would permit the payment of unearned income (or "surplus") to their holding company (and ultimately GFI).

106.    The statement of Genworth's reserves in its various financial reports is a bookkeeping entry and does not necessarily indicate that the full amount of reserves declared is actually segregated in a specific "account."  Nevertheless, the statement of reserve obligations is a critical part of determining whether Genworth's insurance subsidiaries such as GLICNY and GLIC can pay cash dividends to their holding company (and ultimately GFI).

107.    Genworth used those dividends as the "principal sources of cash to pay stockholder dividends and to meet [Genworth's] holding company obligations, including payments of principal and interest on our outstanding indebtedness."  Those obligations also include paying executive compensation and bonuses, many of which are directly tied to the amount of any such dividends "earned" by the holding company.

### F.  **Genworth Claims to Buck Industry Trends and Sets Itself Apart From the Rest of the Long-Term Care Insurance Market**

108.    Between 1988 and 1998, "long-term care insurance ha[d] emerged as the fastest growing type of insurance coverage in the United States, with sales increasing at 20% to 25% a year."[5]  By the late 1990's over 100 carriers were aggressively competing for new policyholders in the LTC insurance market.

109.    But by 2012, the LTC market had deteriorated and several large carriers had exited the market.  As a February 10, 2012 Fitch Ratings report explained, "[t]he long-term care insurance market continues to be plagued by adverse claims experience and poor overall results, which has led to rate instability, insurer solvency concerns, and market exits by several insurers." A July 2013 US Dept. of Health and Human Services study of the LTC market noted that half of the companies who exited the market left after a "new evaluation/assessment of the risk of the product and market."

110.    In the midst of this market upheaval, Genworth consistently denounced any such effects on its own large book of LTC policies.  It attributed its success in the market to its vast experience with the product, and routinely cited its extensive actual claims experience to assure policyholders and potential new customers that its management of its LTC products was superior and not in distress.

111.    Genworth publicly emphasized the importance of its own robust database covering over 40 years of actual claims experience; data which included information on the age and gender of policyholders, the rate of claims, the cause of claims, the duration of claims, the amount paid on claims and so on.

---

[5] Evan Simoff, "LTC Goes Mainstream," Financial Planning (Sept. 1, 1998).

112.     For example, in December 2013, Genworth told the public that it had "very credible experience" data, as a result of its having the "largest insured long-term care database and claims history in [the] industry [with] 190,000 claims processed, $9.8B benefits paid, [and] $5MM paid every business day."  Similarly, in a March 20, 2014 Genworth presentation, its CEO boasted "we're the best in the business, we know more about the business, we have more data, and more experience, than anybody else."

113.     Genworth essentially told existing policyholders and potential new customers that its depth of experience and large book of business set it apart from other LTC insurance providers that were struggling to keep afloat in the face of changing claims experience.

### G. **Based on This Experience Genworth Repeatedly Assures Its Policyholders and Potential Insureds That Its Reserves Are More Than Adequate**

114.     While the rest of the LTC market was floundering, Genworth took every opportunity to assure the public that, based on its vast experience and superior claims data, the company's reserves were more than adequate.

- On a February 6, 2013 call, Defendant Kelleher, CEO of Genworth's Life Ins. Division, affirmed "**we are comfortable that our reserves are adequate and that our capital position is strong**."

- On a May 1, 2013 conference call, Defendant Klein, Genworth's CFO, stated "**[w]e believe reserves for both GAAP and [on a statutory basis] were adequate**."

- In August 2013, Genworth's CEO stated its LTC reserves "**are adequate as we've said before**" and announced that the Company was "**conducting an intense, very broad and deep review of all aspects of our long-term care insurance business**."

- On September 30, 2013, Defendant McInerney, Genworth's CEO, stated "**we continue to look at things every quarter**" and "**our reserves are adequate within margin**."  He added that Genworth was "**very, very confident in what we say**" about the adequacy of its LTC reserves.

•      On an October 30, 2013 conference call, Defendant McInerney confirmed "**And while we have been saying for some time that we believe the reserves were adequate within margin. We're now saying, or I said today, that after this four month extensive review, we're more confident than we've ever been that the reserves are adequate, within a comfortable margin**."

•      In a December 2013 presentation following completion of the Company's deep dive into all aspects of its LTC business, with an emphasis on reserves, Defendant McInerney stated "**we have adequate long-term care reserves, with a margin for future deterioration, and our presentation today provides support for these conclusions**."  This conclusion, Defendant Klein added, was based on "**very credible experience on 190,000 claims that we look at**."   They were so confident, in fact, that as of September 30, 2013, Genworth touted its reserves were adequate, with a comfortable margin, **even if the Company assumed "lower lapse rates" and "less morbidity improvement," resulting in longer average claims**.

•      On February 5, 2014, Genworth again reported positive results for its LTC business.  Genworth reported $42 million in net income from its LTC business, 6 times greater than such profits from the same quarter a year prior.  During a call on these results, Defendant Klein reiterated "**I want to note that Genworth holds more than adequate reserves to satisfy policyholder claims**."

(Emphasis added).

115.    As a UBS securities analyst noted following Genworth's December 2013 presentation, "today's presentation gives us some additional comfort in the adequacy of [Genworth's LTC] reserves" and that UBS was positively "surprised" by Genworth's reserve analysis, in light of the fact that its "peers such as MET[LIFE], PRUDENTIAL and UN[UM] … felt the need to exit the business (with two of the three taking LTC-related charges)."

116.    In light of these repeated assurances that Genworth's financial position was solid and its reserves were more than adequate, policyholders had no indication that their premiums might be substantially increased.  In fact, it appeared to policyholders that Genworth's statements about the adequacy of its reserves were based on up-to-the-minute data of actual claims experience informed by Genworth's superior and vast data set.

117.    Indeed, throughout this period Genworth repeatedly acknowledged publicly that its average claim duration was approximately 3 years.

•       In Genworth's 2010 Annual Report,[6] the Company stated its "long-term care insurance claims typically have a duration of approximately two to four years **with an average duration of approximately three years**."

•       In Genworth's 2011 Annual Report, the Company stated its "long-term care insurance claims typically have a duration of approximately two to five years **with an average duration of approximately three years**."

•       In Genworth's 2012 Annual Report the Company repeated that its "long-term care insurance claims typically have a duration of approximately two to five years **with an average duration of approximately three years**."

•       In Genworth's 2013 Annual Report the Company again confirmed that its "long-term care insurance claims typically have a duration of approximately two to five years **with an average duration of approximately three years**."

118.    Three years was in fact the actual claim duration as reflected in Genworth's vast data set and as experienced by other LTC insurance providers.

119.    Policyholders were repeatedly led to believe that Genworth's reserves were more than adequate based on this actual average claim duration.  Those policyholders continued to make monthly premium payments based on the understanding that Genworth was adequately reserved and financially stable.  More to the point, since Genworth continually assured the public that its reserves were adequate, policyholders rightly believed that their rates would not be increased, even if many other LTC insurance market participants were raising their rates.

120.    Unbeknownst to anyone outside Genworth, however, Defendants had been covering up a massive fraud since at least 2010.  As alleged in *In re Genworth Financial Inc. Secs. Litigation*, 3:14-cv-00682-JRS (E.D. VA. Dec. 22, 2014), Defendants knew that although

---

[6] As a publicly traded company, Genworth was issued its Annual Report on Form 10-K filed with the S.E.C.

the Company's actual claims experience showed a claim duration of nearly 3 years, Genworth's reserves were being calculated based on a claims duration of only 2.2 years. And while Defendants were telling policyholders, regulators and investors that the active life reserve was more than adequately capitalized, they knew it was in fact woefully understated.

121.     Throughout this period GLIC and GLICNY continued to use policyholder premium payments to pay hundreds of millions of dollars in unearned dividends to their holding company (and ultimately GFI) rather than replenish their reserves. These dividends and false surpluses were also used to justify and pay bonuses and salaries to the Individual Defendants themselves.

**H. Genworth's Reserve Fraud is Revealed**

122.     On July 29, 2014, Defendants' house of cards began to fall in on itself. While still reporting a profit, Genworth announced operating income on its LTC insurance business of just $6 million. Genworth noted that claims on its long-term care policies were more "severe", *i.e.* had a longer duration and were more expensive than reflected in its carefully monitored reserve calculations.

123.     On July 30, 2014, the Company shockingly admitted that its reserves had "really been based on experience we had up through about 2010," experience that showed the average claim duration was only 2.2 years. Even then though, as analysts were shocked that the "deep dive" into all aspects of the company's LTC business and reserves appeared to be a smokescreen, Genworth explained that everyone "seem[ed] to be missing a very big point: This is an issue around our **claim reserve,**" *i.e.,* not an issue with its **active life reserves** (which is the far larger reserve component). Genworth's CEO later confirmed the upcoming reserve review would be focused only on the claim reserve and reiterated "the review would not impact the Company's

assessment of its **active life reserves** or margins" and that "we have a much larger **active life reserve**, which is the reserve we hold for the bulk of the 1.2 million policyholders, and that reserve is about five times [larger than] the [disabled life reserves]".

124.    But by September 2014, Genworth began acknowledging that the review of its disabled life claims reserve could "require a corresponding or related change" to the Company's active life reserves.

125.    On November 5, 2014, Genworth revealed that its post-2010 claims data showed the Company's ***active life reserves*** were materially under-reserved to the tune of ***$531 million***. In its slide presentation explaining this new information, Genworth acknowledged that its new reserve calculations were based on updated data showing a claim duration of 2.9 years, as opposed to the 2.2 years that had previously been used to set reserves and determine operating income.

126.    Genworth announced that as a result of this restatement, the Company would "**forego dividend payments from the life division for the remainder of 2014 and 2015**."

**I.    In the wake of this announcement, Genworth's ratings took a severe hit**

127.    Within hours after Genworth's November 5th announcement, Moody's issued a press release stating that it had placed the Company's credit ratings "on review for downgrade." Moody's explained that its decision resulted from the Company's "announcement of a pre-tax $589 million statutory reserve charge ($531 million on a GAAP pre-tax basis) related to its long term care business." Moody's stated that the "charge was the result of the company's review of the assumptions and methodology refinement related to its long-term care disabled life reserves," and warned that "the company remains exposed to further, significant deterioration in its legacy block of business."

128.    Approximately two hours later, S&P issued a press release announcing that it had "lowered its long-term counterparty credit and senior unsecured debt ratings on Genworth" to sub-investment grade (*i.e.*, junk) status. In addition, S&P assigned Genworth a "negative" outlook, which "reflect[ed] the need to rebuild capital strength, the risk of further reserve strengthening, and execution risk in the turnaround of the U.S. life insurance division." The "negative" outlook was also based on S&P's "reassessment of [Genworth] management's operational effectiveness" in light of its recent disclosures.

129.    Finally, less than an hour later, Fitch slashed its Insurer Financial Strength rating for Genworth and its subsidiaries to "BBB" and placed the Company on "Rating Watch Negative." Fitch stated in its press release announcing the downgrades that the "rating action reflects the larger-than-expected charges taken by Genworth Life in 3Q'14 tied to long-term care claim reserve." The Company's $531 million reserve increase, Fitch explained, was well "outside Fitch's prior expectations."

130.    After trading closed on November 6, Genworth issued a "statement in response to actions taken today by certain rating agencies." In the statement, Defendants acknowledged that the rating changes would adversely impact the Company going forward. Defendants further admitted that the rating changes **"are expected to reduce sales in some of [Genworth's] products,"** and **"future borrowing costs are likely to increase."** (Emphasis added).

### J.    Genworth's False Statements Allowed it Divert Hundreds of Millions of Dollars From The Active Life Reserve And Into The Coffers of Its Holding Company and the Pockets of its Senior Executives

131.    Unbeknownst to everyone outside the Company, the fraudulent reserve calculations allowed Genworth's insurance subsidiaries to pay unearned dividends to the Genworth holding company of at least $545 million from 2010 through 2014.

31

132.   Had those dividends been held in reserve, as they should have been, Genworth's reserves would not have been so woefully short.  In fact, in addition to the funds being properly held in reserve, they would have also accrued millions in investment returns that would have also augmented the reserves.

133.   As explained above, LTC insurance is characterized by level premiums and increasing claim costs over the coverage period.  LTC insurance blocks are designed to develop substantial reserves that give rise to investment earnings.  As such, investment income is a significant component of LTC block's business and by inappropriately diminishing the principal available to invest in connection with LTC reserves, Genworth significantly impaired its ability to cover its LTC policyholders at their existing premium levels and diminished the value of those policies.

134.   Before the fraud was revealed, Genworth had been consistently reporting healthy profits from its long-term care business.



135.    Yet, rather than use this income to properly increase reserves as its projected claims exposure grew, Genworth posted false surpluses it then used to justify paying itself handsome dividends.  Below are Genworth's reserve increases since 2007.



136.    In the end, Genworth's reserves may have been adequate had Defendants not regularly paid huge unearned dividends out of the life insurance subsidiaries.

**K.  Genworth and the Individual Defendants Had Various and Powerful Motives to Commit Fraud**

137.    Not only did these false statements of phantom surplus allow the company to improperly inflate its reported income and pay unearned dividends, it also (1) improperly enriched its senior executives; (2) supported a critical $400 million debt offering; and (3)

propped-up Genworth's stock price. Genworth put these individual and corporate interests well ahead of the interests of its policyholders.

(a) The Individual Defendants enriched themselves at the expense of policyholders

138. Executive compensation was determined on a yearly basis by the Compensation Committee of Genworth's board of directors based on certain criteria. It had several components throughout this period, including salary, annual cash incentives, and equity grants primarily in the form of stock appreciation rights ("SARs").[7] These incentives were by far the most valuable component of executive compensation and were tied directly to the performance of Genworth's subsidiaries, measured by preset targets including annual dividends paid to the holding company.

139. These performance based bonuses provided executives with powerful incentives to defraud policyholders.

140. For example, as described in Genworth's 2012 proxy statement:

> Key financial objectives used to evaluate 2011 performance and results are summarized below. Net operating income and ROE [Return on Equity] represent key top-level measures of financial performance for the year. Additionally, **we placed an emphasis on meeting targeted statutory capital ratios and generating dividends to the holding company from our operating segments**. Our insurance subsidiaries both in the U.S. and internationally are subject to various statutory capital requirements, which are important to our ability to write new insurance, to grow our businesses and to pay dividends to the holding company. **These statutory capital requirements, often expressed as ratios and percentages (as shown in the table below), are also important to the financial strength ratings of our insurance subsidiaries and the holding company**.

141. By using the outdated claims data, Defendants were able to understate reserve obligations and create the false appearance on Genworth's publicly reported financial statements

---

[7] Genworth offered its named executive officers other forms of compensation as well, such as health care insurance, life insurance, and retirement benefits.

that the Company and its subsidiaries were far more profitable than they actually were, thus substantially enhancing their own compensation as set forth below.

**2011 Named Executive Officer Incentive Compensation**

142.    Genworth's overall incentive compensation for named executive officers for FY 2011 was positively impacted by the fraud despite results being below preset targets. Specifically, for FY 2011, Genworth reported net operating income ("NOI") of $214 million, or $0.44 per share compared with NOI of $126 million or $0.26 per share for FY 2010, attributing its substantially better results in FY 2011 to "improved performance in life and long-term care insurance." While still short of overall targeted performance goals,[8] the reported results met NOI and return on equity ("ROE") goals for its U.S. Life Insurance segment:

> We completed various product re-pricing actions to improve margins and adjust for the low interest rate environment. Introduced a new generation of long-term care insurance products, expanded the use of reinsurance to manage capital, and generated $265 million on dividends to the holding company.

143.    Thus, while annual incentives remained below targets, primarily due to overall company performance, Frazier was still awarded a cash incentive of $993,072 and SARs valued at $1,248,000. Klein was awarded a cash incentive of $475,000, and stock and options valued at $610,350 based on his leadership as CFO, having joined the company in April 2011, and serving in that capacity starting in May 2011. Likewise, Kelleher received a cash incentive of $673,440, and SARs valued at $343,200. Among the things the Compensation Committee noted it considered in determining Kelleher's incentives were his role in strengthening the statutory capital profile of Genworth's life insurance companies for potential dividend-paying ability to the holding company, initiating actions to improve operating returns and/or capital deployment

---

[8] Genworth attributed the shortfall to the challenging U.S. housing and employment markets that negatively impacted its U.S. Mortgage Insurance segment.

associated with Genworth's in-force long-term care and life insurance blocks through pricing and targeted reinsurance transactions, improving product offerings and new business pricing profitability in long-term care insurance, and achieving product-line sales goals for long-term care insurance.

### 2012 Named Executive Officer Incentive Compensation

144.    Genworth's overall incentive compensation for named executive officers for FY 2012 was positively impacted by the fraud despite again being below preset targets.  While Genworth's reported results for FY 2012 still fell short of pre-set targets for NOI, Net Operating EPS and operating ROE, the overall results were substantially in excess of FY 2011.[9]  According to Genworth, while the U.S. Life Insurance segment was under its target for NOI and ROE for FY 2012, it exceeded its target for Unassigned Surplus (target of 275 versus actual of 345) and dividends to the holding company (target of 172 versus actual of 175).  Moreover, Genworth further claimed that as a result of completing a strategic review and portfolio assessment in 2012, with a priority on increasing earnings and ROE performance in its core insurance businesses, while also generating cash and capital to increase financial strength and flexibility, it ended the year with "improved statutory performance in U.S. Life Insurance segment, positioning that business to provide regular ordinary dividends to the holding company in 2013." Genworth also claimed that holding company cash at the end of 2012 exceeded targeted risk buffers, and it began the process of reducing outstanding debt.

145.    Based on the reported results, the Compensation Committee awarded Klein 88% of his targeted incentive compensation for 2012, or $800,000, along with SARs and stock awards

---

[9] Genworth attributed the shortfall to first quarter losses and reserve strengthening in Australian mortgage insurance business, and below targeted results in the International Protection segment.

valued at $1,529,910.[10] Kelleher was awarded 62% of his targeted amount, or $645,044 plus SARs valued at $1,024,080. For Kelleher, significant weight was given to financial and operational performance of U.S. Life, International protection and Wealth Management segments, including meeting goals in generating dividends to the holding company, and exceeding the target for statutory unassigned surplus "which was viewed as a critical step to enable that segment to pay regular dividends to the holding company in subsequent years."

146.   In addition to the above-listed compensation, and in connection with an announced strategy to rebuild stockholder value, the Compensation Committee approved an incentive and retention program for named executive officers in October 2012 giving stock and cash compensation of $1,000,000 each to Klein and Kelleher and approving a Severance Plan to promote retention, all of which was to vest December 31, 2014, provided the executive was still with the company.

**2013 Named Executive Officer Incentive Compensation**

147.   Incentive compensation to named executive officers was substantially enhanced in FY 2013 as a result of positive financial results buoyed in large part by the fraud. For example, Genworth's reported NOI of $616 million or $1.25 per share, compared to $403 million or $0.82 per share in FY 2012:

> This performance represents significant progress toward our turnaround priorities, and our 2013 financial results generally exceeded our goals for the year. The financial results were driven primarily by . . . improving returns in our U.S. Life Insurance Division, particularly through the benefit of rate increases on older blocks of our long-term care insurance business.

---

[10] Fraizer received certain payouts in 2012 in connection with his resignation from the company and his severance agreement as set forth in the chart below.

148.    In addition, the U.S. Life Insurance segment contributed $206 million in dividends to the holding company compared to a performance target of $200 million.

149.    Based on the positive results, the Compensation Committee awarded McInerney an annual incentive award of 150% of his targeted amount, or $3,000,000, in consideration of, among other things, his contributions toward developing, implementing and communicating to investors a strategy to improve performance of Genworth's long-term care insurance business; executing strategies for holding company cash accumulation, allocation and deployment to improve its financial flexibility.

150.    Klein received an incentive award of 148% of his target, or $1,150,000, and SARs valued at $531,050, purportedly in consideration of his efforts in executing Genworth's strategic plan to rebuild shareholder value, including:

- Collaborating with Genworth's businesses to execute its U.S. mortgage insurance capital plan, which supports strategic financial flexibility for the holding company;

- Actively managing relationships with rating agencies to stabilize holding company and other business unit ratings;

- Collaborating with Genworth's businesses and investor relations function to improve investor understanding of its long-term care insurance business.

151.    Kelleher, on the other hand, was terminated effective December 31, 2013, but notwithstanding his termination, Kelleher received massive payouts under the Severance Plan approved by Genworth's board on October 31, 2012, as set forth below:

| | |
|---|---|
| Cash Severance (lump sum payment of two times base salary plus two times target bonus). | 2,295,000 |
| Pro-Rated Annual Incentive (lump sum cash payment based on actual performance results through end of 2013). | 600,000 |

| Cash Retention Incentive (lump sum payment of retention incentive approved 2012). | 1,000,000 |
| Continued Health Coverage (lump sum payment of monthly cost of healthcare times 12). | 19,522 |
| Partial Equity Vesting (immediate vesting of SARs and Options that would have vested on next scheduled vesting date). | 3,019,589 |
| SERP Vesting (accelerated vesting of pension benefits) | 1,042,131 |
| Restoration Plan Vesting (provides supplemental benefits to executives not eligible for retirement plan). | 319,829 |
| **Total paid to Kelleher on termination** | **$8,926,101** |

152.    The chart set forth below sets forth the total compensation paid to each of the named Individual Defendants between 2010 and 2013.

| Name | Year | Salary + Bonus | Stock Awards | Option Awards | Non-Equity Incentive Pay | Total [11]Comp |
|---|---|---|---|---|---|---|
| Klein | 2011 | 390,095 | 375,600 | 234,750 | 475,000 | 1,796,900 |
| | 2012 | 924,344 | 513,000 | 1,016,910 | 800,000 | 3,419,475 |
| | 2013 | 908,443 | | 531,050 | 1,150,000 | 2,698,124 |
| | | | | | | |
| Frazier | 2010 | 1,121,403 | | 4,198,480 | 1,000,000 | 6,932,262 |
| | 2011 | 1,121,403 | | 1,248,000 | 993,072 | 4,292,129 |
| | 2012 | 582,267 | 1,591,817 | 1,714,334 | | 6,686,686 |
| | | | | | | |
| McInerney | 2013 | 973,799 | 790,000 | 7,056,600[12] | 3,000,000 | 11,986,064 |
| | | | | | | |
| Kelleher | 2010 | 595,206 | | 1,154,582 | 450,000 | 2,438,740 |
| | 2011 | 638,337 | | 343,200 | 673,440 | 2,034,692 |
| | 2012 | 647,922 | | 1,024,080 | 645,044 | 2,834,152 |
| | 2013 | 647,922 | | 1,752,135 | 600,000 | 7,157,337[13] |
| | | | | | | |
| **Totals** | | **8,551,141** | **3,270,417** | **20,274,121** | **9,786,566** | **52,276,561** |

[11] Total compensation contains additional compensation not set out in detail in this chart including such items as healthcare insurance premiums, life insurance premiums, retirement plan contributions, and deferred compensation.

[12] McInerney's stock and option awards for 2013 were made in connection with his hire as CEO.

[13] Kelleher's total compensation includes amounts received pursuant to the Severance Plan.

(b) Genworth's false statements about the adequacy of its reserves and profitability of its LTC business was critical to a strategic debt offering.

153. On December 5, 2013, just one day after its December 2013 Presentation, Genworth announced a strategic public debt offering in which the Company sought to raise $400 million. Based on these positive assurances, the debt offering was a success.

154. The Individual Defendants' statements allowed the Company to artificially preserve its investment grade credit and debt ratings in advance of its December 2013 Offering. By misrepresenting critical facts about the Company's LTC business and review, Defendants delayed significant rating downgrades, which immediately followed the announcement of the Company's reserve increase in November 2014.

155. Defendants thus had an incentive to misrepresent the scope of their review, and the soundness of their reserves, during the December 2013 Presentation in advance of their debt offering the next day.

(c) Defendants false statements help prop-up Genworth's stock price

156. The health of Genworth's LTC insurance business was critically important to its stock price. In 2014, for example, LTC premiums accounted for more than 68% of all premiums written by GLIC and nearly one third of all premiums written by GLICNY (more than $2.5 billion in written premiums).

157. GFI's stock price was also critically important to the Individual Defendants because it directly influenced their compensation, job security and the value of the company stock they each owned.

158. As alleged in greater detail in a class action complaint in the matter of *In re Genworth Financial Inc. Secs. Litigation*, 3:14-cv-00682-JRS (E.D. VA. Dec. 22, 2014),

Defendants succumbed to these influences and allegedly committed securities fraud to prop-up Genworth's stock price by manipulating the accounting for its long-term care insurance reserves.

159.    That scheme was effective in maintaining GFI's stock at inflated prices, until the fraud was revealed to investors and GFI's stock price tumbled.

160.    In the wake of revelations that Genworth's reserves had been underfunded by more the half a billion dollars, GFI's stock lost nearly 40% of its value in a single day.  The Company's stock is now trading at close to $4.00 per share, a steep decrease from highs of over $18 per share in 2014.

161.    Ultimately, Genworth announced a settlement of that action in March 2016.  The settlement included a $219 million cash payment to the class of investors.  This settlement further depleted the Company's assets and contributed to its precarious financial condition.

162.    This fraud on the market has also impaired the Company's ratings, inhibiting its ability to raise additional cash through future public offerings.[14]

## HARM TO PLAINTIFFS AND CLASS MEMBERS
## AS A RESULT OF DEFENDANTS' CONDUCT

163.    As detailed in the following chart, Defendants' manipulation of Genworth's financials resulted in the payment of at least $545 million in dividends from GLIC and GLICNY to Genworth's holding company from 2010 through 2013.

---

[14] Further restricting the Company's ability to raise capital was the revelation that Genworth was one of seventeen insurance groups that the New York Department of Financial Services ("NYDFS") found had engaged in practices knowns as "Shadow Insurance."  *See generally* "Shining a Light on Shadow Insurance: A Little-Known Loophole That Puts Insurance Policyholders and Taxpayers at Greater Risk," NYDFS, June 2013.  In that report, Genworth was found to have engaged in various practices that resulted in Genworth taking more than $1 billion in reserve credit based on questionable reinsurance transactions that, along with the impaired ratings, further hindered Genworth's ability to recover from its fraudulent underfunding of its reserves.

| Fiscal Year | Dividends Paid to Holding Company |
|---|---|
| 2010 | $30,000,000 |
| 2011 | $134,000,000[15] |
| 2012 | $175,000,000 |
| 2013 | $206,000,000 |
| **2010-2013** | **$545,000,000** |

Source: Genworth Proxy Statements from 2011-2014.

The total amount of dividends paid during this three-year period closely approximates the amounts that should have been reserved absent the fraud. Thus, as alleged above, rather than properly use these funds to shore-up the Company's reserves, as they were obligated to do both by reporting and accounting requirements and the duties of good faith and fair dealing owed to each of their LTC policyholders, Defendants used these funds for their own self-interest.

164. Among other things, the funds were used to create the illusion of profitability of Genworth's LTC insurance business which afforded (1) GFI an inflated stock price; (2) GFI, GLIC and GLICNY inflated financial stability ratings; and (3) Genworth $400 million from a much needed public offering that would not have been possible had the market known Genworth's true financial condition. For Genworth, the scheme also falsely depicted Genworth's financial strength and stability, all while seemingly avoiding the same level of rate increases that had plagued Genworth's competitors. For the Individual Defendants, the scheme afforded them (1) unwarranted job security, (2) millions of dollars in unearned annual compensation and (3) (temporary) increases in the value of their Genworth securities, earned through their employment.

---

[15] Elsewhere in Genworth's 2013 Proxy Statement, however, the Company states "We completed various product re-pricing actions to improve margins and adjust for the low interest rate environment, introduced a new generation of long-term care insurance products, expanded the use of reinsurance to manage capital, **and generated $265 million in dividends to the holding company**." (Emphasis added). Accordingly, the dividends paid may actually be substantially higher than reflected in this table.

165.     The false perception created by Defendants' conduct induced new customers to buy LTC policies from Genworth and existing Genworth LTC policyholders to continue making payments on their policies, actions they would not have undertaken had the true condition of Genworth been revealed earlier, or had Plaintiffs and Members of the Classes known that the Company they trusted to provide LTC insurance was actively working to defraud them and others to enrich themselves.

166.     The false depiction of Genworth's financial condition and adequacy of reserves meant that current policyholders' decisions to continue paying premiums were made without the benefit of all material information.  For new policyholders that purchased policies between 2010 and November 5, 2014, they did so without the benefit of material information about both the trustworthiness of the Defendants, as well as the inadequacy of Genworth's LTC reserves and the instability of the Company and the LTC products they purchased.

167.     Each payment by Plaintiffs and the Classes during the Class Period was based on several false pretexts, promises, financial statements and betrayed trust, as set forth herein.  Each premium payment by Plaintiffs and the Classes during this period represents damages to them.

168.     Due to Defendants' failure to adequately reserve premiums paid on these LTC policies to meet future obligations, the value of each Class members' policies has also been diminished, in part because Defendants now need to raise additional capital to adequately fund reserves either through public financing, premium rate increases, or other sources of funds, acts that will continue to damage the Class in the future.

169.     Because the reserves were so depleted by Defendants' fraud, the value of each Class member's LTC policies has been substantially reduced, in part because the benefits that can be provided based on the decreased reserves has been materially diminished.

170.    Defendants' bad acts have also forced a Hobson's choice on each Class member in which they must choose between maintaining a policy, first purchased largely upon trust, with a company that chose to defraud them, or to walk away from their investment with Genworth and purchase a new policy from a competing company at a higher premium due to the insureds' advanced age.

171.    For those that would chose to remain with Genworth because they now have limited options, they will either (1) be paying substantially higher premiums for the same level of coverage, or (2) be paying the same premiums for substantially reduced coverage.  Either way, these options demonstrate Class members have been damaged.

172.    For those that chose to purchase a new policy from another insurer, the premiums on such a policy will be substantially higher because the investment they made with Genworth at a younger age to attain a lower premium is now worthless, and they must procure new more expensive insurance from another company due to their older age.

173.    For all Class members, Genworth has completely frustrated the purpose of purchasing an LTC policy at a younger age and investing thousands of dollars to attain lower premiums.  Essentially, the investment all Class members made with Genworth has been squandered by the Defendants, and their premiums have been usurped for Defendants' own benefit.

## **CLASS ACTION ALLEGATIONS**

174.    Plaintiffs Erika Leifer, Saul Jacobs and Helene Wenzel bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of themselves and the following class (the "Class") consisting of:

> All persons residing in the United States who, at any time prior to November 5, 2014 (the "Class Period"), purchased long-term care

insurance from Genworth Life Insurance Company or Genworth Life Insurance Company of New York.

175.     Plaintiff Erika Leiffer also brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of herself and the following subclass ("New York Subclass"):

> All persons residing in the State of New York who, at any time prior to November 5, 2014 (the "Class Period"), purchased long-term care insurance from Genworth Life Insurance Company of New York.

176.     Plaintiff Saul Jacobs also brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of himself and the following subclass ("Pennsylvania Subclass"):

> All persons residing in the Commonwealth of Pennsylvania who, at any time prior to November 5, 2014 (the "Class Period"), purchased long-term care insurance from Genworth Life Insurance Company.

177.     Plaintiff Helene Wenzel also brings this suit as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1), (b)(2) and/or (b)(3) on behalf of herself and the following subclass ("California Subclass"):

> All persons residing in the State of California who, at any time prior to November 5, 2014 (the "Class Period"), purchased long-term care insurance from Genworth Life Insurance Company.

178.     These proposed Classes each exclude the Defendants and any entity in which Defendants have a controlling interest, and their officers, directors, legal representatives, successors and assigns.  The Classes also exclude government entities and judicial officers that have any role in adjudicating this matter.

179.     The Class and Subclasses satisfy the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23(a) and (b)(3).

180.     The members of the Class and Subclasses are so numerous that joinder of all members is impracticable.  Although the precise number of Class Members and their identities are unknown to Plaintiffs at this time, that information can all be obtained efficiently through Defendants' records.  It is reasonably estimated that the Class and Subclasses, each consist of at least many thousands of members.

181.     Plaintiffs each purchased LTC policies from Genworth Life Insurance Company, Genworth Life Insurance Company of New York, or a predecessor of either company, prior to November 5, 2014 and were damaged by Defendants' failure to adequately fund Defendants' LTC reserves as alleged herein.  Plaintiffs are each members of their respective Classes, and their claims are typical of the claims of the members of the Classes. The harm suffered by Plaintiffs and all other Class Members was and is caused by the same misconduct by Defendants.

182.     Common questions of law and fact exist as to all members of the Classes, which predominate over any questions that may affect individual Class Members.  Among the many questions of law and fact common to the Classes are the following:

a.   the nature, scope and operation of Defendants' scheme to underfund reserves and inflate profits;

b.   whether Defendants deliberately and/or otherwise improperly underfunded their LTC insurance reserves during the Class Period;

c.   whether Defendants paid unearned dividends from Genworth's subsidiaries to its holding company because of the underfunding of LTC insurance reserves or the understating of its LTC reserve obligations;

d.   whether the Individual Defendants received unearned compensation as a result of their accounting manipulations including, without limitation, the underfunding of LTC insurance reserves or the understating of its LTC reserve obligations;

e.   whether Defendants breached duties of good faith and fair dealing to Plaintiffs and the Classes as alleged herein;

f.   whether Defendants violated New York Insurance Law subsection 4226(a);

g.  whether Defendants violated New York General Business Law section 349;

h.  whether Defendants were unjustly enriched;

i.  whether Defendants' conduct diminished the value of Plaintiffs' and members of the Classes' LTC policies;

j.  whether Defendants' conduct in underfunding its reserves and inflating profits artificially inflated the ratings that Defendant received from its principal ratings agencies;

k.  whether Defendants' conduct damaged Plaintiffs and members of the Classes;

l.  whether Defendants concealed the nature, scope and operation of Defendants' scheme to underfund reserves and inflate profits;

m.  whether Defendants should be enjoined from further misconduct; and

n.  the appropriate measure of damages or other relief to which Plaintiffs and the Class Members are entitled.

183.  Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs do not have any interest antagonistic to, or in conflict with, the Classes.

184.  Plaintiffs have retained competent counsel, who are experienced in consumer and commercial class action litigation, to further ensure such protection and who intend to prosecute this action vigorously.

185.  Class action status is warranted under Rule 23(b)(1) because the prosecution of separate actions by or against individual members of the Classes would create the risk of inconsistent or varying adjudications with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendants, or because the prosecution of separate actions by or against individual class members would create the risk of adjudication with respect to individual members of the Classes which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

186.    Class action status is also warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

187.    Class action status is also warranted under Rule 23(b)(3) because questions of law or fact common to the class predominate over any questions affecting only individual members and a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members are relatively small in comparison to the expense of this litigation, those expenses and the burden of individual litigation make it impractical for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims were not available, Defendants would likely continue their wrongful conduct, would unjustly retain improperly obtained revenues, and/or would otherwise escape liability for their wrongdoing as asserted herein.

188.    Information relating to Defendants' alleged misconduct and the identity of the various Class and Subclass members is available from Defendants' books and records, including, but not limited to, their policyholder records, financial statements, proxies and other records and reports filed with the United States Securities and Exchange Commission as well as financial statements and reports filed with various state Insurance Commissions.

189.     Plaintiffs are not aware of any difficulty that will be encountered in the management of this litigation which would preclude its maintenance as a class action.

190.    The prosecution of separate actions by individual Class Members would run the risk of inconsistent or varying adjudications, which might establish incompatible standards of

conduct for Defendants.  Prosecution as a class action will eliminate the possibility of repetitious or inconsistent litigation.

191.    Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes as a whole.

## CLAIMS FOR RELIEF

### COUNT ONE
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
(AGAINST GLICNY AND GLIC ON BEHALF OF PLAINTIFFS, THE CLASS, THE
NEW YORK SUBCLASS, THE CALIFORNIA SUBCLASS AND THE PENNSYLVANIA
SUBCLASS)**

192.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

193.    Every insurance contract contains an implied covenant of good faith and fair dealing.

194.    Pursuant to that covenant, parties to an insurance contract agree that they will do nothing to injure the rights of the other parties to receive the benefits of the contract.

195.    The LTC insurance contracts of Plaintiffs and the Class members contain an implied covenant of good faith and fair dealing, pursuant to which Genworth was bound to perform its obligations in good faith and to deal fairly with Plaintiffs and the Class members.

196.    Under the LTC insurance contracts, Genworth was required to reserve an adequate portion of the premiums paid by Plaintiffs and the Class Members to ensure future claims could be paid.

197.    Plaintiffs and the Class Members have met their obligations under the contract and are not in breach of any term (implied or implicit) of their contracts.

198.     Defendants, however, have breached their duties of good faith and fair dealing in

at least the following respects, among others:

    a.   Failing to adequately fund reserves for their LTC policies;

    b.   Providing policyholders with inaccurate information about Genworth's reserve obligations and the adequacy of reserves;

    c.   Using inaccurate information about its claims experience to understate its reserve obligations and underfund its reserves for LTC policies;

    d.   Failing to inform policyholders that reserves were not being calculated properly between 2010 and November 5, 2014, and in fact repeatedly affirming to policyholders and potential insureds that Genworth's LTC reserves were adequate or more than adequate during the Class Period;

    e.   Failing to inform policyholders that the fraudulent accounting practices alleged herein have contributed to Genworth's reserve shortfall;

    f.   Misrepresenting to consumers and policyholders the true reason for rate increases;

    g.   Diverting funds that should have been used to adequately fund LTC reserves to pay unearned dividends to the holding company and investors as well as increase executive compensation;

    h.   Failing to treat policyholders interests under the contract with the same degree of importance as their own interests; and

    i.   Failing to protect investment returns that should have been earned on an adequate reserve fund for the benefit of policyholders.

199.     As a direct, proximate, and legal result of the aforementioned breaches of the

covenant of good faith and fair dealing, Plaintiff and the Class members have suffered damages

and are entitled to relief.

**COUNT TWO**
**VIOLATION OF NEW YORK INSURANCE LAW SECTION 4226(a)**
**(AGAINST GLICNY ON BEHALF OF PLAINTIFF LEIFER AND THE NEW YORK**
**SUBCLASS)**

200.     Plaintiffs hereby incorporate by reference the preceding paragraphs as if they

were fully set forth herein.

201.    New York Insurance Law Section 4226(a) imposes liability on any insurer that misrepresents its financial condition or the capital reserve system that it maintains to protect itself against the risk of financial loss.  N.Y. Ins. Law § 4226(a)(4) ("No insurer authorized to do in this state the business of life, or accident and health insurance, or to make annuity contracts shall: . . . (4) make any misleading representation, or any misrepresentation of the financial condition of any such insurer or of the legal reserve system upon which it operates.").

202.    As set forth in this complaint, GLICNY knowingly understated its reserve obligations and underfunded its reserves.  They did this to artificially suppress the amount of money that GLICNY was required to hold in its reserves (*i.e.*, decrease its liabilities) and thereby inflate its surplus (*i.e.*, Admitted Assets less liabilities).  Because dividends are only permitted by regulators to be paid from surplus funds, Defendants knowingly overstated the "surplus" by understating Genworth's reserve obligation and using those funds to pay hundreds of millions of dollars in unearned dividends to the defendant holding company.

203.    Likewise, by concealing the actual claims experience and utilizing outdated figures to understate its reserve obligations, GLICNY's artificially inflated its RBC ratio.  As set forth in this Complaint, Defendants knew that the ratings issued by the rating agencies on its LTC insurance products were based in significant part on the RBC ratio which they were actively manipulating.  Yet, Defendants touted those ratings to its customers and otherwise touted its financial condition.

204.    In doing all this, Defendants ensured their scheme would not only be concealed from state insurance commissions, but also would be concealed from rating agencies and current and future policyholders.

205.    These knowing misrepresentations violated New York Insurance Law Section 4226.

206.    Further, the conduct described herein made Genworth's affirmative representations regarding its financial condition and the representations in its financial and regulatory statements, materially misleading.  Defendants knew these statements were materially misleading, but willfully made such statements and recklessly failed to correct or qualify them.

207.    Genworth charges premiums in return for the LTC insurance contracts it issues, and as set forth above, Defendants knowingly violated New York Insurance Law Section 4226(d) and knowingly received premiums and other compensation in consequence of such violation.

208.    The payors of these premiums—including Plaintiff Leifer and the New York Subclass—are "aggrieved" persons under New York Insurance Law Section 4226(d). Plaintiff Leifer and the New York Subclass paid premiums for the LTC policies issued by GLICNY which were subject to GLICNY's misrepresentations about its reserve obligations and the underfunding of its reserves.  Thus, Plaintiff Leifer and the New York Subclass fall within the zone of persons protected by the statute.

209.    The payors of these premiums – including Plaintiff Leifer and the New York Subclass – were harmed by GLICNY's misconduct.  If GLICNY's financial condition had been reported accurately, Defendants would not have been able to pay hundreds of millions of dollars in unearned dividends to the Genworth holding company and, thus, GLICNY's reserves would not have been so woefully underfunded.  Moreover, had Defendants accurately reported Genworth's (including GLICNY's) financial condition, rating agencies would have downgraded

Genworth's ratings earlier, new policyholders would not have purchased Long-term Care insurance policies from Genworth during this period, and existing policyholders may have stopped paying premiums on their policies and made other investments with their money.

210.    Had the monies used to pay unearned dividends been held in reserve, as they should have been, Plaintiff Leifer and the New York Subclass would have also benefited from the investment income derived from the hundreds of millions of dollars that should have been reserved and invested.

211.    As a consequence and direct result of GLICNY's misleading representations and misrepresentations about its financial condition and its legal reserve system upon which it operates, Plaintiff Leifer and the New York Subclass are entitled to recover, as a statutory penalty, the premiums they have paid in connection with their LTC policies.  N.Y. Ins. Law § 4226(d) ("Any such insurer that knowingly violates any provision of this section, or knowingly receives any premium or other compensation in consequence of such violation shall, in addition to any other penalty provided in this chapter, be liable to a penalty in the amount of such premium or compensation, which penalty may be sued for and recovered by any person aggrieved for his own use and benefit, in accordance with the provisions of the civil practice law and rules.").

### COUNT THREE
### VIOLATION OF NEW YORK GENERAL BUSINESS LAW § 349
### (AGAINST GLICNY ON BEHALF OF PLAINTIFF LEIFER AND THE NEW YORK SUBCLASS)

212.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

213.    Defendants' actions alleged herein constitute unlawful, unfair, and deceptive business practices. Those actions include misrepresenting the adequacy of GLICNY's reserves

during the Class Period. Those actions also included omitting material information about the reason for the inadequacy of those reserves from the letters sent to Plaintiff Leifer and members of the New York Subclass purporting to explain why GLICNY was raising their premium rates by 60%, and inducing them to remain GLICNY policyholders.

214.    Defendants' conduct constitutes acts, uses and/or employment by GLICNY or their agents or employees of deception, unconscionable and unfair commercial practices, false pretenses, false promises, misrepresentations and/or the knowing concealment, suppression, and omission of material facts with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of goods in violation of Section 349 of New York's General Business Law.

215.    Defendants' deceptive conduct was generally directed at the consuming public which includes not only current policyholders, but also prospective customers and the public in general.

216.    Defendants' unfair and deceptive trade acts and practices have directly, foreseeably, and proximately caused damages and injury to Plaintiff Leifer and other members of the New York Subclass.

217.    Defendants' violations of Section 349 of New York's General Business Law have damaged Plaintiff Leifer and other proposed New York Subclass Members, and threaten to cause additional injury if the violations continue.

218.    Defendants' deceptive conduct has caused harm to consumers in that they purchased GLICNY's LTC products, or continued paying premiums on those products based on (1) false and material statements about Genworth's financial stability, honesty, trustworthiness and future viability of its LTC products and (2) without the benefit of material yet omitted information

about the inadequacy of the company's reserves and the fraudulent and deceptive acts perpetrated

by the Defendants. Each premium payment made during the Class Period represents economic

damages to Plaintiff Leifer and the New York Subclass. They have also been damaged through the

diminution of value of their policies as a result of Defendants' deceptive conduct and other

damages set forth above.

**COUNT FOUR**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW**
**BUSINESS AND PROFESSIONAL CODE §§ 17200 *ET SEQ.***
**(AGAINST GFI, GLIC, AND THE INDIVIDUAL DEFENDANTS ON BEHALF OF**
**PLAINTIFF WENZEL THE CALIFORNIA SUBCLASS)**

219.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were

fully set forth herein.

220.    Throughout the relevant period, Defendants have regularly conducted business

throughout the State of California.

221.    California Business & Professions Code §§ 17200 *et seq.* prohibits acts of unfair

competition, including any "unlawful, unfair or fraudulent business act or practice."

222.    Plaintiff Wenzel and the California Subclass assert this cause of action under the

"unfair," "unlawful," and "fraudulent" prongs of the statute.

223.    Defendants engaged in unfair, unlawful or fraudulent business acts and practices in

violation of California Business & Professions Code §§ 17200, *et seq.*, in that: (a) Defendants'

conduct is unlawful because it is fraudulent; (b) Defendants' practices and conduct are immoral,

unethical, oppressive and substantially harmful to Plaintiff Wenzel and the members of the

California Subclass; (c) the justification for Defendants' practices and conduct is outweighed by

the gravity of the injury to Plaintiff Wenzel and the California Subclass; (d) Defendants' practices

constitute unfair, fraudulent, untrue or misleading actions in that such conduct is likely to deceive

and, in fact, did deceive members of the public.

55

224.   Defendants' unlawful, unfair, and/or fraudulent business practices are described herein and include, without limitation:

a.   Failing to adequately fund reserves for their LTC policies;

b.   Providing policyholders with inaccurate information about Genworth's reserve obligations and the adequacy of those reserves;

c.   Using inaccurate information about its claims experience to understate its reserve obligations and underfund its reserves for LTC policies;

d.   Failing to inform policyholders that reserves were not being calculated properly between 2010 and November 5, 2014, and in fact repeatedly affirming to policyholders and potential insureds that Genworth's LTC reserves were adequate or more than adequate during the Class Period;

e.   Failing to inform policyholders that the fraudulent accounting practices alleged herein have contributed to Genworth's reserve shortfall;

f.   Misrepresenting to consumers and policyholders the true reason for rate increases;

g.   Diverting funds that should have been used to adequately fund LTC reserves to pay unearned dividends to the holding company and investors as well as increase executive compensation;

h.   Failing to treat policyholders interests under the contract with the same degree of importance as their own interests;

i.   Failing to protect investment returns that should have been earned on an adequate reserve fund for the benefit of policyholders;

j.   Omitting material information about the reason for the inadequacy of Genworth's LTC reserves from the letters sent to Plaintiff Wenzel and members of the California Subclass purporting to explain why Genworth was raising their premium rates by 26%, and inducing them to remain Genworth policyholders; and

k.   Engaging in other unfair and/or unlawful conduct as described in this Complaint.

225.   The foregoing acts and practices have detrimentally impacted competition and caused substantial harm to Plaintiff Wenzel and the members of the California Subclass.  Plaintiff Wenzel and the members of the California Subclass have suffered injuries in fact and have lost money as a result of Defendants' conduct.

226.    By reason of the foregoing, Defendants should be required to pay damages in an amount to be proven at trial, disgorge their illicit profits and/or make restitution to Plaintiff Wenzel, the general public, and the members of the California Subclass, and/or be enjoined from continuing in such practices pursuant to §§ 17203 and 17204 of the California Business & Professions Code.

**COUNT FIVE**
**INSURANCE BAD FAITH (VIOLATION OF 42 Pa.C.S. § 8371)**
**(AGAINST GFI AND GLIC ON BEHALF OF PLAINTIFF JACOBS AND THE PENNSYLVANIA SUBCLASS)**

227.    Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

228.    GFI and GLIC owed duties to Plaintiff Jacobs and members of the Pennsylvania Subclass under both the common law and 42 Pa. C.S. § 8371 to act in good faith and in a reasonable manner in connection with any and all obligations it owes under the Policy.

229.    GFI and GLIC  breached these duties and, without reasonable justification and with improper motives, acted in bad faith by:

    a.  Failing to adequately fund reserves for their LTC policies;

    b.  Providing policyholders with inaccurate information about Genworth's reserve obligations and the adequacy of those reserves;

    c.  Using inaccurate information about its claims experience to understate its reserve obligations and underfund its reserves for LTC policies;

    d.  Failing to inform policyholders that reserves were not being calculated properly between 2010 and November 5, 2014, and in fact repeatedly affirming to policyholders and potential insureds that Genworth's LTC reserves were adequate or more than adequate during the Class Period;

    e.  Failing to inform policyholders that the fraudulent accounting practices alleged herein have contributed to Genworth's reserve shortfall;

    f.  Misrepresenting to consumers and policyholders the true reason for rate increases;

g.   Diverting funds that should have been used to adequately fund LTC reserves to pay unearned dividends to the holding company and investors as well as increase executive compensation;

h.   Failing to treat policyholders interests under the contract with the same degree of importance as their own interests;

i.   Failing to protect investment returns that should have been earned on an adequate reserve fund for the benefit of policyholders;

j.   Omitting material information about the reason for the inadequacy of Genworth's LTC reserves from the letters sent to Plaintiff Jacobs and members of the California Subclass purporting to explain why Genworth was raising their premium rates by 20%, and inducing them to remain Genworth policyholders; and

k.   Engaging in other unfair and/or unlawful conduct as described in this Complaint.

230.   Plaintiff Jacobs and members of the Pennsylvania Subclass were injured as a direct and proximate result of GFI's and GLIC's breaches of their duties.

231.   As a result Plaintiff Jacobs and members of the Pennsylvania Subclass are entitled to: (1) an award of damages against Defendants pursuant to 42 Pa. C.S A. §8371(3) in an amount that will fully compensate them for their damages, as well as reasonable attorneys' fees, expenses and costs incurred in the prosecution of this action; (b) an award of punitive damages against GFI and GLIC  pursuant to 42 Pa. C.S.A § 8371(2); and (3) any such additional relief as the Court may deem just and proper.

### COUNT SIX
### UNJUST ENRICHMENT/RESTITUTION
### (AGAINST GFI AND THE INDIVIDUAL DEFENDANTS ON BEHALF OF PLAINTIFFS, THE CLASS AND EACH SUBCLASS)

232.   Plaintiffs hereby incorporate by reference the preceding paragraphs as if they were fully set forth herein.

233.   Defendants collected hundreds of millions of dollars in premium payments from Plaintiffs and the Class during the Class Period.  Yet, Defendants received at least $545 million in unearned dividends from the insurance subsidiaries (including GLIC and GLICNY). Those funds

were made possible by Defendants' conduct alleged herein, including the deliberate and knowing understatement of reserve obligations through the manipulation of the expected claims duration. These unearned dividends were then used by the Defendants to pay the Individual Defendants unwarranted compensation and otherwise expended to meet the obligations of the company.

234.    As a result of Defendants' conduct, they have each received a benefit at the expense of Plaintiffs and proposed Class Members that would be unjust for them to retain.

235.    As a result of Defendants' unjust enrichment, Plaintiff and the Class Members are entitled to restitution in the form of a return of the unjust financial benefit conferred by Plaintiffs and Class Members on Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter a judgment against Defendants and in favor of Plaintiffs and the Classes and award the following relief:

A.    That this action be certified as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, declaring Plaintiffs as representatives of the Class and their respective Subclasses and Plaintiffs' counsel as counsel for the Class and Subclasses;

B.    That the conduct alleged herein be declared, adjudged and decreed to be unlawful;

C.    That Plaintiffs and the Classes they represent be awarded compensatory, consequential, and general damages in an amount to be determined at trial pursuant to Count One;

D.    That Plaintiffs and the Subclasses they represent be awarded statutory damages pursuant to Counts Two, Three, Four and Five;

E.    That Plaintiffs and the Classes they represent be awarded restitution and/or disgorgement of Defendants' ill-gotten gains pursuant to Count Six;

F.    Injunctive relief as is warranted;

G.    Costs and disbursements of the action;

H.    Pre-and post-judgment interest;

I.      Reasonable attorneys' fees; and

J.      Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to all claims in this action.


Dated: December, 28 2016                    Respectfully submitted,

                                            _____*s/ Kristi C. Kelly*_____
                                            Kristi C. Kelly, Esq. (VSB #72791)
                                            Kelly & Crandall, PLC
                                            4084 University Drive, Suite 202a
                                            Fairfax, VA 22030
                                            Tel.:   (703) 424-7570
                                            Fax.:   (703) 591-0167
                                            kkelly@kellyandcrandall.com

                                            GOLDMAN SCARLATO & PENNY, P.C.
                                            Brian D. Penny
                                            Paul J. Scarlato
                                            161 Washington Ave, Suite 1025
                                            Conshohocken, PA 19428
                                            Tel.:   (484) 342-0700
                                            Fax.:   (484) 580-8747
                                            penny@lawgsp.com
                                            scarlato@lawgsp.com

                                            BERGER & MONTAGUE, P.C.
                                            Shanon J. Carson
                                            Glen L. Abramson
                                            Peter R. Kahana
                                            Lane L. Vines
                                            Patrick F. Madden
                                            Y. Michael Twersky
                                            1622 Locust Street
                                            Philadelphia, PA  19103
                                            Tel.:  (215) 875-3000
                                            Fax:  (215) 875-4604
                                            scarson@bm.net
                                            gabramson@bm.net
                                            pkhana@bm.net
                                            lvines@bm.net
                                            pmadden@bm.net

mitwersky@bm.net

*Attorneys for Plaintiffs and the Proposed
Class and Subclasses*